# EXHIBIT 5



**BRAIN FREQUENCY SYSTEM LICENSE AND SERVICES AGREEMENT**

This **Brain Frequency System License and Services Agreement** ("Agreement") is made by and between **Brain Frequency LLC,** a Texas limited liability company having an address of 26229 N. Cranes Mill Road, Canyon Lake, TX 78133 ("Brain Frequency"), and the following entity ("Licensee"):

Name: _____

Address: _____

This Agreement may refer to Brain Frequency and Licensee individually as a "Party" and together as the "Parties."

Effective Date: _____

This Agreement grants Licensee access to the following features of the Brain Frequency System, subject to the enclosed Terms and Conditions and the parameters stated below:

- o  Brain Frequency System:  iPad application and online platform
- o  Permitted Locations:  Licensee's facility located at 27158 Triton Dr., Spring Branch, Texas 78070
- o  Usage Fee:  _____ per EEG processed by the Brain Frequency System. The minimum Usage Fee in any calendar month is _____.
- o  Subscription Fee:  Waived
- o  Initial Term:  one (1) year from the Effective Date.

**Licensee contact information for notices**:        Name:
                    Phone:
                    Email Address:

LICENSEE ACKNOWLEDGES AND AGREES THAT IT HAS READ AND FULLY UNDERSTANDS ALL OBLIGATIONS AND LIMITATIONS OF THIS AGREEMENT, WHICH INCLUDES THE ATTACHED TERMS AND CONDITIONS, WHICH ARE MADE A PART OF THIS AGREEMENT. BY SIGNING BELOW LICENSEE AGREES TO BE BOUND BY THIS AGREEMENT.

LICENSEE ACKNOWLEDGES AND AGREES THAT NEITHER BRAIN FREQUENCY NOR THE BRAIN FREQUENCY SYSTEM PROVIDES MEDICAL ADVICE, INSTRUCTION FOR DIAGNOSIS OF A MEDICAL CONDITION, OR INSTRUCTION FOR TREATMENT OF A MEDICAL CONDITION. LICENSEE IS RESPONSIBLE FOR MAKING ITS OWN DECISIONS ABOUT A DIAGNOSIS OR COURSE OF TREATMENT FOR ANY INDIVIDUAL'S MEDICAL CONDITION AND MUST ENSURE THAT ITS USERS ARE FULLY AWARE OF THIS BEFORE USING THE BRAIN FREQUENCY SYSTEM.

132161420.8

The Parties accept and enter into this Agreement, including the enclosed Terms and Conditions and Schedules attached hereto, by signatures of their authorized representatives below.

If the person executing this Agreement is doing so on behalf of a company or other legal entity, that person represents that they have the authority to bind such entity to this Agreement.

**Brain Frequency LLC**

By: _____

Name: _____

Title: _____

**Licensee:** _____

By: _____

Name: _____

Title: _____



**TERMS AND CONDITIONS**

1. **Definitions.**

1.1. "Brain Frequency System" means the elements of Brain Frequency's software and online platform for analyzing an EEG and producing an output for potential conditions and protocols for a medical professional to consider when developing a treatment plan for the patient from whom the EEG was collected.

1.2. "Brand Guidelines" means any written guidelines issued by Brain Frequency governing (a) use of Brain Frequency's trademarks, service marks, or (b) room décor and/or personnel attire governing the facilities in which the Brain Frequency System is used. Brain Frequency's current Brand Guidelines are attached as Schedule 4, which Brain Frequency may amend from time to time upon notice to Licensee.

1.3. "Cover Sheet" means the cover pages that include the Parties' signatures and which, together with these Terms and Conditions, comprise the Agreement.

1.4. "Documentation" means Brain Frequency's technical and legal documentation for the Brain Frequency System, as Brain Frequency may update from time to time during the Term, including without limitation training material, external usage policies, and security, privacy and architecture documentation.

1.5. "Fees" means, collectively and individually, Lease Fees, Subscription Fees and Usage Fees.

1.6. "Initial Term" has the meaning stated in the Cover Sheet.

1.7. "Lease Fees" means the fees for lease of any equipment that may be set forth in Schedule 2 attached hereto.

1.8. "Licensee" means the entity identified in the first paragraph of this Agreement.

1.9. "Party" and "Parties" have the meanings stated in the Cover Sheet.

1.10. "Patient Data" means any data that Licensee provides to the Brain Frequency System that contains personally identifiable health information as defined by federal and/or state privacy laws or otherwise refers to any particular individual.

1.11. "Permitted Locations" means the location or locations listed in the Cover Sheet.

1.12. "Platform" means the elements of the Brain Frequency System that Brain Frequency makes available to Licensee on a cloud service basis.

1.13. "Renewal Term" has the meaning stated in Section 6(a) below.

1.14. "Subscription Fees" means the fees due for access to the Brain Frequency System and receipt of the Support Services during the Term, in the amount stated in the Cover Sheet, subject to modification as stated in these Terms and Conditions.

1.15. "Support Services" means the training services, maintenance services and other services as defined in this agreement or the attached Schedule 1 – Support Services Addendum.

1.16. "Term" means the Initial Term plus any Renewal Term.

1.17. "Updates" and "Upgrades" have the meanings stated in Section 3(b) below.

1.18. "<u>Usage Fees</u>" means the fees due for using the Brain Frequency System to process an EEG and generate an output, in the amount stated in the Cover Sheet, subject to modification as stated in these Terms and Conditions.

1.19. "<u>User</u>" means an employee or independent contractor of Licensee who accesses the Brain Frequency System.

2. **<u>Grant of License</u>.**

2.1. <u>License</u>. Brain Frequency hereby grants to Licensee a non-exclusive license to (a) install and use the installable applications of the Brain Frequency System in source code form, and to permit its Users to use the Brain Frequency System as installed on Licensee's hardware, and (b) access and use the Platform, and to permit its users to do the same, in each case in the Permitted Locations during the Term.

2.2. <u>Conditions of Use</u>. The License and rights granted to Licensee under this Agreement are subject to the following conditions:

2.2.1. All Users will be required to create or receive a unique login credential, and all Users must use their unique login credential to access the Brain Frequency System.

2.2.2. Licensee must acquire the equipment listed on <u>Schedule 2</u> for operation of the Brain Frequency System, and Licensee must use the Brain Frequency System only on such equipment. If <u>Schedule 2</u> states that Licensee will purchase the equipment, Licensee may purchase the equipment from a vendor of Licensee's choice, so long as the equipment is purchased new and in good condition. If <u>Schedule 2</u> states that Licensee will lease the equipment from Brain Frequency, then the terms of this Agreement will apply to such lease.

2.3. <u>License and Usage Restrictions</u>. Licensee agrees that Licensee and its Users will not:

2.3.1. sell, resell, sublicense, distribute, rent, lease or otherwise permit a third party to access or use the Brain Frequency System or any portion of the same;

2.3.2. interfere with or disrupt the integrity or performance of the Brain Frequency System or any data contained in it, such as by using files, scripts, agents or programs that are intended or likely to do harm, including, for example, viruses, worms, time bombs and Trojan horses;

2.3.3. attempt to gain unauthorized access to the Platform or its related systems or networks;

2.3.4. permit direct or indirect access to or use of the Brain Frequency System in a way that circumvents any usage limitations reasonably imposed by Brain Frequency;

2.3.5. copy the Brain Frequency System or any component, feature, function or user interface of the Brain Frequency System;

2.3.6. remove, modify or obscure any trademark, or any other name or logo, of Brain Frequency or its service providers that may appear in the Brain Frequency System or any leased equipment;

2.3.7. attempt to reverse engineer any aspect of the Brain Frequency System or leased equipment in whole or in part, nor attempt to create a substitute or similar product through the use of or access to the Brain Frequency System;

2.3.8. access to or use the Platform by automated electronic processes such as "bots," "spiders," "scrapers," "webcrawlers," or other computer programs that monitor, copy, reproduce or download data or other content found on, or accessed through, the Platform;

2.3.9. use the Brain Frequency System or any leased equipment to violate any law, statute, ordinance or regulation;

4

2.3.10.  use or permit use of the Brain Frequency System or any leased equipment outside of the Permitted Locations;

2.3.11.  allow multiple Users to share a single login credential, or share or permit Users to share login credentials with any third party;

2.3.12.  create liability for Brain Frequency or its affiliates or service providers, or cause Brain Frequency or its affiliates to lose (in whole or in part) the services of any service provider; or

2.3.13.  Interfere in any manner with Brain Frequency proprietary rights in the Brain Frequency System; Guidelines and Documentation.

3.  <u>Support Services</u>. In exchange for the applicable service Fees, during the Term Brain Frequency will provide the following Services:

3.1.  <u>Training</u>. Brain Frequency will provide Licensee with the training services described in <u>Schedule 1</u> attached hereto. Unless otherwise agreed to in writing, all training will be conducted at Brain Frequency's facilities or through remote, online training courses or conferencing services. If Licensee requests training on-site at Licensee's facility, then Licensee shall pay for Brain Frequency's reasonable travel, lodging, meals and other expenses incurred in connection with such services upon presentation of receipts by Brain Frequency. Licensee shall be responsible for all costs associated with travel for Licensee's personnel to any training location.

3.2.  <u>Updates and Upgrades</u>. Brain Frequency will provide Licensee with all updates such as bug fixes and other modifications that Brain Frequency may generally provide to its other customers who have licensed the Brain Frequency System on similar terms (collectively, "<u>Updates</u>"). Updates will not include upgrades, add-ons or other enhancements or modifications that Brain Frequency offers for an additional fee (collectively, "<u>Upgrades</u>"). If Licensee purchases a license for an Upgrade from Brain Frequency, then unless otherwise agreed in writing the Upgrades will be licensed to Licensee under the terms of this Agreement.

3.3.  <u>Other Services</u>. If <u>Schedule 1</u> includes other Services, then Brain Frequency will provide the other Services described in <u>Schedule 1</u>.

4.  <u>Licensee Responsibilities</u>.

4.1.  <u>Equipment</u>. Licensee shall be responsible, at its sole cost and expense, for all aspects of: (i) the equipment that Licensee and its Users operate to use or access the Brain Frequency System; (ii) any networks or systems via which Licensee and its Users access the Platform; and (iii) any third-party software that Licensee or its Users may use in connection with the Brain Frequency System. Brain Frequency may specify commercially reasonable minimum hardware, software, or service requirements for use of the Brain Frequency System, including but not limited to the equipment requirements set forth on <u>Schedule 2</u>, and Brain Frequency shall not be responsible for any issues caused by Licensee's or a User's failure to implement such requirements.

4.2.  <u>Updates</u>.  Licensee shall accept and install all Updates that Brain Frequency designates as a required Update, and Licensee shall cease using any versions of the Brain Frequency System that preceded such an Update. Licensee's failure to comply with this paragraph will immediately void all warranties, in which case Brain Frequency will have no liability to Licensee under this Agreement or otherwise for Licensee's continued use of the pre-Update version.

4.3.  <u>Equipment Maintenance and Return</u>. Licensee shall properly handle and maintain all equipment that Licensee leases from Brain Frequency. Licensee must return all such equipment to Brain Frequency at the end of the applicable lease period in good working condition, with no more than normal wear.

5

4.4. <u>Licensure and Competency</u>.  All Users must be licensed and registered to practice medicine in the jurisdiction of the Permitted Location at which they use the Brain Frequency System or employed under the supervision of a professional who is so licensed and registered. All Users must have the requisite experience and skill to practice in the area of medicine and/or behavioral health within which they are using the Brain Frequency System. Licensee shall ensure that each of its Users does not use the Brain Frequency System in connection with the diagnosis or treatment of a patient in a practice area that is not consistent with that User's experience, training and competency.

4.5. <u>Insurance</u>.  Licensee must, at its sole expense during the Term and for at least one (1) year afterward maintain and secure (i) Commercial General Liability Insurance to include contractual liability, products/completed operations liability, and cross-liability coverage with minimum limits of $1,000,000 per occurrence and $3,000,000 aggregate; and (ii) Medical Professional Liability insurance in at least the basic coverage amounts required by applicable law. The Commercial General Liability Insurance policy must name Brain Frequency as additional insured.

4.6. <u>Patient Consent</u>.  Licensee shall obtain, from each person for whom Licensee provides Patient Data to the Brain Frequency System, written consent for the provision of that person's Patient Data to the Brain Frequency System. Such consent shall include, without limitation, the right for Brain Frequency and its affiliates to use the Patient Data in accordance with this Agreement. Licensee shall also obtain all necessary consents and approvals as may be required by law or regulation to provide Patient Data to the Brain Frequency System.

4.7. <u>Promotional and Informational Materials</u>.  Licensee must not share documents, web pages or other communications to describe, promote or otherwise inform patients about the Brain Frequency System unless Brain Frequency has given prior written approval to Licensee's dissemination of such materials.

4.8. <u>Décor</u>. In each room where Licensee operates the Brain Frequency System, Licensee shall comply in all respects with Brain Frequency's Brand Guidelines, including but not limited to specifications for room furnishings and colors, ambient conditions and personnel attire.

4.9. <u>Non-solicitation</u>: During the Term of this Agreement, and for a period of one (1) year thereafter, neither Party shall solicit the employment of, employ, or contract with, the current or former personnel of the other Party with whom it had contact under this Agreement, either individually or through another party or employee.  Notwithstanding the foregoing, neither Party will be precluded from hiring any employee of the other Party who responds to any public notice or advertisement of an employment opportunity or who terminated his/her employment with the other Party at least six (6) months previously, provided that the hiring Party did not solicit the termination.  A Party shall not be in breach of this Section 4.9 if those responsible for the solicitation, hiring, or retention of the other Party's personnel were not aware of these restrictions; however, personnel of either Party working pursuant to any services shall be presumed to know of this restriction.

4.10. <u>Quality Control Inspection Rights</u> Licensee shall be subject to Brain Frequency's inspection of Licensee's relevant operation, including premises, documentation and records, to determine quality control compliance with the Brain Frequency System, Brand Guidelines and Documentation. Any such inspection shall be conducted during Licensee's regular business hours with reasonable advance notice. If an inspection reveals that Licensee is not in compliance with the Brain Frequency System, Brand Guidelines or Documentation Licensee shall be informed and required to immediately correct any deficiency or be subject to immediate termination of this Agreement notwithstanding anything to the contrary in paragraph 6.2 (Termination for Cause).

5. <u>Fees, Invoicing and Payment</u>.

5.1. <u>Payment Terms</u>.

5.1.1. Licensee shall pay all Fees, in addition to any sales or use taxes that may apply to Licensee's use of the Brain Frequency System or to Licensee's receipt of the Services

5.1.2. Payment shall be by check or electronic funds transfer in accordance with instructions provided by Brain Frequency.

5.1.3. Lease Fees will be due prior to the start of the applicable lease period. Brain Frequency will issue an invoice on a monthly or other periodic basis. Licensee shall pay the amount due in each invoice for Usage Fees and Subscription Fees within fifteen (15) days from the date of the invoice.

5.1.4. Payment obligations are non-cancelable, and Fees paid are non-refundable.

5.1.5. Licensee is responsible for providing complete and accurate billing and contact information to Brain Frequency and notifying Brain Frequency of any changes to such information.

5.1.6. Brain Frequency may modify each of the Fees, typically not more than once per calendar year, by providing Licensee with at least thirty (30) days' advance written notice. If Licensee does not wish accept the modified Fees, Licensee may terminate this Agreement by providing written notice to Brain Frequency before the modification takes effect.

5.2. <u>Overdue Charges</u>. Any invoiced amount not received by Brain Frequency when due shall accrue interest at the rate of 1.5% of the outstanding balance per month or the maximum rate permitted by law, whichever is lower. This accrual does not limit or replace any other right that Brain Frequency may have under this Agreement due to Licensee's failure to pay a balance when due.

5.3. <u>Suspension of Service</u>. If any amount owed by Licensee under this Agreement is fifteen (15) or more days overdue, Brain Frequency may, without limiting its other rights and remedies, either suspend Licensee's services and license to use the Brain Frequency System and until such amounts are paid in full or (at Brain Frequency's option) terminate this Agreement.

5.4. <u>Taxes</u>. Fees do not include any taxes, levies, duties or similar governmental assessments of any nature, including, for example, value-added, sales, use or withholding taxes, assessable by any jurisdiction whatsoever. Licensee is responsible for paying all taxes associated with its purchases. Notwithstanding the foregoing, Brain Frequency is solely responsible for taxes assessable against it based on its income, property and employees.

5.5. <u>Recordkeeping and Inspection</u>. Licensee shall maintain adequate books and records in connection with its activities under this Agreement. Such records shall include invoicing, payment and other financial records associated with each transaction. Brain Frequency may audit the relevant books and records of Licensee to ensure compliance with the payment terms of this Agreement and accurate calculation of the Subscription Fees. Any such audit shall be conducted during Licensee's regular business hours with reasonable advance notice. If an audit reveals that Licensee has underpaid Fees to Brain Frequency, Licensee shall immediately pay the underpaid Fees to Brain Frequency. In the event that underpaid Fees are greater than five (5%) percent of the amount due to Brain Frequency for the period audited, then Licensee shall also pay the auditor's reasonable fees and expenses.

6. <u>Term and Termination</u>.

6.1. <u>Term</u> This Agreement begins on the Effective Date will continue for the Initial Term, after which point it shall automatically renew for additional one year renewal periods (each, a "<u>Renewal Term</u>") unless earlier (i) terminated in accordance with this Agreement or (ii) not later than sixty (60) days prior to the expiration of the then-current term, either Party gives written notice to the other Party of its intent to not renew.

6.2. <u>Termination for Cause</u>. Either Party may terminate this Agreement:

6.2.1. upon thirty (30) days' written notice if the other Party materially breaches this Agreement and does not cure the breach before the expiration of such period; or

6.2.2. immediately on written notice if the other Party becomes the subject of a petition in bankruptcy or any other proceeding (whether voluntary or involuntary) relating to insolvency, administration, receivership, administrative receivership, liquidation or assignment for the benefit of creditors, or if

132161420.8

the other Party suspends or ceases, or threatens to suspend or cease, carrying on all or a substantial part of its business, or takes or suffers any similar or analogous procedure, action or event in consequence of debt in any jurisdiction.

6.3. <u>Effects of Termination</u>. Upon termination for any reason: (i) Licensee and its Users shall cease using the Brain Frequency System; (ii) Licensee shall return to Brain Frequency all equipment that it has leased from Brain Frequency; and (iii) each Party shall either return to the other all Confidential Information of the other Party in its possession or under its control, or provide written certification of destruction of the same.

6.4. <u>Survival</u>. Notwithstanding any other provision of this Agreement: (i) the termination of this Agreement for any reason will not relieve Licensee of its outstanding payment obligations; and (ii) the following articles and sections of this Agreement will survive termination: <u>7</u> (Confidentiality), <u>8</u> (Intellectual Property), <u>9.4</u> through <u>9.6</u> (Warranty Disclaimer), <u>10</u> (Indemnification), <u>11</u> (Limitation of Liability), and <u>12</u> (General), and all Schedules attached hereto.

7. <u>Confidentiality</u>.

7.1. <u>Definition of Confidential Information</u>. "<u>Confidential Information</u>" means all information disclosed by a Party ("<u>Disclosing Party</u>") to the other Party ("<u>Receiving Party</u>"), whether orally or in writing, that is designated as confidential or that reasonably should be understood to be confidential given the nature of the information and the circumstances of disclosure. Confidential Information of Brain Frequency includes the Documentation and Brain Frequency's pricing information stated in this Agreement. Confidential Information of each Party includes that Party's business and marketing plans, technology and technical information, product plans and designs, and business processes disclosed by such Party. However, Confidential Information does not include any information that: (i) is or becomes generally known to the public without breach of any obligation owed to the Disclosing Party; (ii) was known to the Receiving Party prior to its disclosure by the Disclosing Party without breach of any obligation owed to the Disclosing Party; (iii) is received from a third party without breach of any obligation owed to the Disclosing Party; or (iv) was independently developed by the Receiving Party by individuals who had no access to the Disclosing Party's Confidential Information.

7.2. <u>Protection of Confidential Information</u>. The Receiving Party must: (i) not use any Confidential Information of the Disclosing Party for any purpose other than to perform its obligations under this Agreement; and (ii) not disclose the Disclosing Party's Confidential Information to anyone other than its affiliates, employees and contractors and service providers who need that access for purposes consistent with this Agreement and who have signed confidentiality agreements with the Receiving Party containing protections no less stringent than those in this Agreement. Notwithstanding the above, to the extent that usage data relating to Licensee's usage of the Brain Frequency System is accessible to Brain Frequency or its affiliates, Brain Frequency and its affiliates may use such data: (i) for Brain Frequency's and its affiliates' internal purposes to improve or enhance product or service offerings; and (ii) in aggregate form to offer products or services to others, so long as such use does not reveal personally identifiable information for any individual User or patient.

7.3. <u>Compelled Disclosure</u>. The Receiving Party may disclose Confidential Information of the Disclosing Party to the extent compelled by law to do so, provided the Receiving Party gives the Disclosing Party prior notice of the compelled disclosure (to the extent legally permitted) and reasonable assistance, at the Disclosing Party's cost, if the Disclosing Party wishes to contest the disclosure. If the Receiving Party is compelled by law to disclose the Disclosing Party's Confidential Information as part of a civil proceeding to which the Disclosing Party is a party, and the Disclosing Party is not contesting the disclosure, the Disclosing Party will reimburse the Receiving Party for its reasonable cost of compiling and providing secure access to that Confidential Information.

7.4. <u>Identification as Customer</u>. Licensee agrees that Brain Frequency may publicly identify Licensee as a customer and user of the Brain Frequency system, and that Brain Frequency may use Licensee's name and logo for this limited purpose.

7.5. <u>Patient Data</u>. As between the Parties, Licensee shall own the Patient Data, and Brain Frequency shall own all data that is not Patient Data, including any de-identified data or aggregated data derived from Patient Data that does not include any individually identifiable health information (collectively, "<u>Derived Data</u>"). The Parties shall comply with the terms and conditions of the Business Associate Addendum set forth in <u>Schedule 3</u> attached hereto, which is incorporated herein by reference (the "<u>Business Associate Addendum</u>"), with respect to the use and disclosure of all "protected health information" (as such term is defined under the Health Insurance Portability and Accountability Act of 1996, as amended, and the regulations related thereto) in connection with this Agreement. In the event of a conflict between the terms and conditions of this Agreement and the Business Associate Addendum, the Business Associate Addendum shall control. Brain Frequency may use Derived Data in connection with developing, testing, maintaining, modifying, or otherwise improving the Brain Frequency System.

8. <u>Intellectual Property</u>.

8.1. <u>Ownership</u>. Brain Frequency retains all right, title and interest in and to the Brain Frequency System and Documentation, including but not limited to intellectual property rights. This Agreement does not transfer to Licensee title to or any intellectual property rights in the Brain Frequency System or Documentation, except for the license rights expressly granted in this Agreement.

8.2. <u>License to Use Feedback</u>. Licensee hereby grants to Brain Frequency and its affiliates a worldwide, perpetual, transferrable, irrevocable, royalty-free license to use and incorporate into their respective service or product offerings any suggestion, enhancement request, recommendation, correction or other feedback provided by Licensee relating to the operation of the Brain Frequency System.

8.3. <u>Trademarks</u>. Licensee acknowledges that all trademarks and trade names used by Brain Frequency in connection with the Brain Frequency System, whether registered or not (collectively, "<u>Trademarks</u>"), are the property of Brain Frequency or its affiliates. Licensee may use the Trademarks only according to Brain Frequency's written Brand Guidelines. Brain Frequency may revise the Brand Guidelines from time to time upon written notice to Licensee. Licensee shall acquire no rights in any Trademarks. All goodwill that may arise in any Trademarks through Licensee's usage of the Brain Frequency System shall inure to Brain Frequency, and by this Agreement Licensee assigns such goodwill to Brain Frequency

9. <u>Representations, Warranties and Disclaimers</u>.

9.1. <u>Representations</u>. Each Party represents that it has validly entered into this Agreement and has the legal power to do so.

9.2. <u>Brain Frequency Warranties</u>. Brain Frequency warrants to Licensee that the Brain Frequency System will perform in substantial accordance with the applicable Documentation. If the Brain Frequency System does not perform as warranted, Licensee shall notify Brain Frequency of the purported failure to perform, and Brain Frequency will use commercially reasonable efforts to correct any errors or malfunctions in the Brain Frequency System. If the correction is not commercially feasible, then Licensee's exclusive remedy shall be to terminate this Agreement and receive a pro rata refund of any Fees paid by Licensee to Brain Frequency which are allocable to the period after the effective date of termination. This warranty shall not apply to the extent of any non-compliance resulting from: (i) the combination of the Brain Frequency System with any non-Brain Frequency software, service or hardware not specifically authorized in the documentation provided by Brain Frequency; (ii) changes to any component of the Brain Frequency System made by Licensee or any other third party without Brain Frequency's approval; (iii) the failure by Licensee or its Users to use the Brain Frequency System in accordance with the documentation provided by Brain Frequency; (iv) any use of the Brain Frequency System on or with hardware or software for which it is not designed; or (v) circumstances beyond Brain Frequency's reasonable control, including but not limited to, the failure of third party servers, communication systems or changes to operating systems.

9.3. <u>Licensee Warranties</u>. Licensee warrants to Brain Frequency that Licensee has obtained and will maintain any and all consents, approvals, licenses, or other authorizations necessary for the performance of its obligations under this Agreement.

132161420.8

9.4.  <u>Equipment</u>.  Brain Frequency is not responsible for any equipment that Licensee acquires from a third party. With respect to equipment leased from Brain Frequency, the manufacturer's warranty, if any, that is in effect at the time is the sole warranty that applies to any such equipment, and Licensee's remedies for leased equipment are limited to those actually provided by the manufacturer. Brain Frequency will reasonably assist Licensee in resolving warranty claims with manufacturers of leased equipment.

9.5.  <u>WARRANTY DISCLAIMER</u>.  EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, BRAIN FREQUENCY DOES NOT MAKE OR GIVE ANY OTHER REPRESENTATIONS, WARRANTIES, CONDITIONS OR GUARANTEES WHATSOEVER REGARDING THIS AGREEMENT, THE BRAIN FREQUENCY SYSTEM, THE SUPPORT SERVICES OR THE DOCUMENTATION PROVIDED BY BRAIN FREQUENCY, THE SUBJECT MATTER OF THIS AGREEMENT OR ANY RELATED MATTER. BRAIN FREQUENCY DOES NOT REPRESENT THAT THE BRAIN FREQUENCY SYSTEM WILL OPERATE ON A CONTINUOUS OR ERROR-FREE BASIS. BRAIN FREQUENCY DISCLAIMS ALL REPRESENTATIONS, WARRANTIES, CONDITIONS, AND GUARANTEES OF EVERY NATURE AND KIND WHATSOEVER, EXPRESS OR IMPLIED BY LAW, INCLUDING ANY STATUTE OR REGULATION, OR ARISING FROM CUSTOM OR TRADE USAGE OR BY ANY COURSE OF DEALING OR COURSE OF PERFORMANCE, INCLUDING WITHOUT LIMITATION ANY REPRESENTATIONS, WARRANTIES OR CONDITIONS OF MERCHANTABILITY, NON-INFRINGEMENT OR FITNESS FOR A PARTICULAR PURPOSE.

9.6.  <u>MEDICAL DISCLAIMER - NO MEDICAL ADVICE</u>. NEITHER BRAIN FREQUENCY NOR THE BRAIN FREQUENCY SYSTEM PROVIDES MEDICAL ADVICE, INSTRUCTION FOR DIAGNOSIS OF A MEDICAL CONDITION, OR INSTRUCTION FOR TREATMENT OF A MEDICAL CONDITION. LICENSEE IS RESPONSIBLE FOR MAKING ITS OWN DECISIONS ABOUT A DIAGNOSIS OR COURSE OF TREATMENT FOR ANY INDIVIDUAL'S MEDICAL CONDITION AND SHALL ENSURE THAT ITS USERS ARE FULLY AWARE OF THIS BEFORE USING THE BRAIN FREQUENCY SYSTEM.

10.  <u>Indemnification</u>.

10.1.  <u>By Brain Frequency</u>. Brain Frequency will defend and indemnify Licensee against any claim, demand, suit or proceeding made or brought against Licensee based on a claim, demand, suit or proceeding that alleges that the use of the Brain Frequency System in accordance with this Agreement infringes or misappropriates such third party's intellectual property rights on its own and not in combination with any other software, system or service not supplied by Brain Frequency (collectively, "<u>Claims</u>"), and Brain Frequency will indemnify Licensee from any damages, attorney fees and costs finally awarded against Licensee by Licensee by a court or under a court-approved settlement of a Claim, so long as Licensee: (i) promptly gives Brain Frequency written notice of the Claim; (ii) gives Brain Frequency sole control of the defense and settlement of the Claim; and (iii) gives Brain Frequency all reasonable assistance that Brain Frequency may require to resolve the Claim. If Brain Frequency receives information about an actual or potential Claim, Brain Frequency may in its discretion: (A) provide an Update that modifies the Brain Frequency System so that it no longer infringes or misappropriates, in which case Licensee must accept and install the Update to maintain its rights under this paragraph; (B) obtain a license for Licensee's continued use of the Brain Frequency System in accordance with this Agreement; or (C) terminate this Agreement and provide Licensee a pro rata refund of any Fees paid by Licensee to Brain Frequency which are allocable to the period after the effective date of termination. The defense and indemnification obligations of this paragraph do not apply to the extent that a Claim: (i) arises from or includes any software, hardware or service not supplied or specifically authorized by Brain Frequency; or (ii) arises in whole or in part from Licensee's breach of this Agreement.

10.2.  <u>By Licensee</u>.  Licensee will defend and indemnify Brain Frequency and its affiliates from and against any claim, demand, suit or proceeding made or brought against Brain Frequency or any of its affiliates that relates to medical advice that Licensee or its Users provide to any patient (collectively, "<u>Liabilities</u>"), and Licensee will indemnify Brain Frequency and its affiliates from any damages, attorney fees and costs finally awarded against Brain Frequency or its affiliate by a court or under a court-approved settlement of a Liability, so long as Brain Frequency: (i) promptly gives Licensee written notice of the Liability; (ii) gives Brain Frequency sole control of the defense and settlement of the Liability; and (iii) gives Brain Frequency all reasonable assistance that Brain Frequency may require to resolve the Liability. .

10

11. <u>Limitation of Liability</u>.

11.1. <u>Limitation of Liability</u>. BRAIN FREQUENCY'S TOTAL LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT (WHETHER IN CONTACT OR TORT OR UNDER ANY OTHER THEORY OF LIABILITY) SHALL NOT EXCEED THE AMOUNT PAID BY LICENSEE TO BRAIN FREQUENCY IN THE TWELVE (12) MONTHS THAT IMMEDIATELY PRECEDED THE EVENT THAT RESULTED IN THE LIABILITY. IN NO EVENT SHALL BRAIN FREQUENCY BE LIABLE FOR ANY INCIDENTAL, INDIRECT, SPECIAL, CONSEQUENTIAL, PUNITIVE OR EXEMPLARY DAMAGES, INCLUDING BUT NOT LIMITED TO DAMAGES RELATING TO BUSINESS INTERRUPTION OR LOSS OF DATA.

11.2. <u>Exclusion of Consequential and Related Damages</u>. In no event shall Brain Frequency have any liability to Licensee under this Agreement or otherwise for any indirect, special, incidental, punitive or consequential damages, even if Brain Frequency has been advised (or is otherwise aware) of the possibility of such losses in advance.

11.3. <u>Force Majeure</u>.  In no event shall Brain Frequency be responsible or liable for any failure or delay in the performance of its obligations under this Agreement that arise out of or are caused by forces beyond its control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, pandemics or epidemics, interruptions in communication networks or computer systems, failure of a non-Brain Frequency application, failure of Licensee or its Users to employ minimum technology requirements, denial of service attacks, fires, natural catastrophes, extreme weather events, or acts of God.

12. <u>General</u>.

12.1. <u>Entire Agreement and Order of Precedence</u>. This Agreement, together with the Schedules attached hereto, which are hereby incorporated by reference herein, is the entire agreement between the Parties regarding the Brain Frequency System, Support Services and any leased equipment, and supersedes all prior and contemporaneous agreements, proposals or representations, written or oral, concerning its subject matter. No modification, amendment, or waiver of any provision of this Agreement will be effective unless in writing and signed by the Party against whom the modification, amendment or waiver is to be asserted.

12.2. <u>Relationship of the Parties</u>. The Parties are independent contractors. This Agreement does not create a partnership, franchise, joint venture, agency, fiduciary or employment relationship between the Parties. Neither Party will represent that it has any authority to assume or create any obligation, express or implied, on behalf of the other Party, nor to represent the other Party as agent, employee, franchisee, or partner in any other capacity or legal sense.

12.3. <u>No Third-Party Beneficiaries</u>. This Agreement will inure to the benefit of and will be binding upon the Parties and their respective successors and permitted assigns. There are no third-party beneficiaries to this Agreement. The rights of the Parties to terminate, rescind or agree any variation, waiver or settlement under this Agreement is not subject to the consent of any person that is not a Party to this Agreement.

12.4. <u>Force Majeure</u>. No Party will be liable for delay or damages if prevented from fulfilling its obligations (excluding payment obligations) by reason of acts of God, acts of war (whether declared or undeclared), insurrection, terrorism, or acts of hostilities (such as invasion or bombing), lockouts, strikes, riots, floods, fires, communications system failures, governmental restrictions covering the use of Internet-based application and support services, export restrictions imposed by any Government, any other cause beyond the control of such Party (each, a "<u>Force Majeure Event</u>"). In case of Force Majeure Event, the Party's performance obligations will be extended by a reasonable period of time corresponding to the delay caused by the Force Majeure Event. The Party experiencing the Force Majeure Event will inform the other affected Parties in writing within fifteen (15) days after a fact or event of Force Majeure Event has been recognized to have occurred.

12.5. <u>Notices</u>. All notices, permissions and approvals related to this Agreement will be in writing and will be deemed to have been given upon (i) personal delivery, (ii) the second business day after mailing if sent by nationally recognized overnight courier or by first class, certified mail, return receipt requested, (iii) the

second business day after sending by confirmed facsimile, (iv) electronic mail to delivered the email address listed in this Agreement, or (v) except for notices of termination or an indemnifiable claim, the day of sending by email. If the last day for giving any notice or taking any action required or permitted under this Agreement would otherwise fall on a Saturday, Sunday or legal holiday, that last day shall be postponed until the next legal business day. Notices to Brain Frequency shall be addressed to the attention of Brain Frequency LLC, ATTN: Contracts Administrator, 26229 N. Cranes Mill Road, Canyon Lake, TX 78133 or shannon@brainfrequencycenter.com. Billing-related notices to Licensee will be addressed to the relevant billing contact designated by Licensee, and all other notices to Licensee will be addressed to the attention of the Licensee representative stated on the Cover Sheet. Either Party may change its address specified for notice by giving the other Party prior written notice in accordance with this paragraph.

12.6.   <u>Waiver; Cumulative Remedies</u>. No failure or delay by either Party in exercising any right under this Agreement will constitute a waiver of that right. The Parties' respective rights and remedies under this Agreement are cumulative and not exclusive of any other rights or remedies to which the Parties may be lawfully entitled under this Agreement or at law or equity. The Parties will be entitled to pursue any and all of their respective rights and remedies concurrently, consecutively and alternatively.

12.7.   <u>Governing Law; Dispute Resolution</u>. This Agreement shall be governed by and construed under the laws of the State of Texas, without regard to conflict of law principles. In the event that a dispute arises under this Agreement that the Parties are unable to resolve after at least thirty (30) days of good faith negotiation, then any proceeding filed to resolve the dispute must be filed in a state or federal court located in Texas. By signing this Agreement, each Party irrevocably consents to the exclusive jurisdiction of such courts.

12.8.   <u>Severability</u>. If any provision (or part of a provision) of this Agreement is held by a court of competent jurisdiction to be invalid, illegal or unenforceable, it shall, insofar as it is severable from the remainder of this Agreement, be deemed omitted from this Agreement, and the remaining provisions of this Agreement will remain in effect.

12.9.   <u>Assignment</u>. Neither Party may assign any of its rights or obligations under this Agreement, whether by operation of law or otherwise, without the other Party's prior written consent. Notwithstanding the above, either Party may assign this Agreement in its entirety, upon written notice and without the other Party's consent, in connection with a merger, acquisition, corporate reorganization, or sale of all or substantially all of its assets. Any attempted transfer or assignment by either Party in violation of the foregoing shall be void and of no effect and shall not be binding upon or enforceable against the other Party. Subject to the foregoing, this Agreement will bind and inure to the benefit of the Parties, their respective successors and permitted assigns.

**Schedule 1**

**Support Services Addendum**

Training:  As part of this collaboration, Brain Frequency shall provide Licensee with training for up to two (2) users (with respect to the technical use and application of the Brain Frequency System) at Brain Frequency 's offices. Licensee shall pay for all travel, hotel, and other expenses related to training such personnel. The scope and content of such training shall be solely determined by Brain Frequency. In addition, Brain Frequency will provide weekly support (up to 1 hour per meeting) at a scheduled weekly meeting for the first 4 weeks of operation.

Other Services:  Brain Frequency will make software maintenance and support personnel available to answer operational questions for the Brain Frequency System during the hours of 9 am to 5 pm CST, Monday-Friday (excluding federal holidays).    All support inquiries shall be directed to _____. Brain Frequency does not guarantee specific response times and will act on support inquiries in the order received.

13

**Schedule 2**

**Equipment**

EQUIPMENT REQUIREMENTS:  Live in Alignment is required to purchase the following equipment:

(a)    (1) Brain Frequency approved TMS Treatment Machine and Chair;

(b)    (1) Dry Q20 EEG Cap

Magventure

*System configuration includes the following products:*

| | |
|---|---|
| 9016E0761 | . MagPro®  R30-PR Magnetic Stimulator, 230V |
| 9016E0521 | · Cool B70 dynamic cooled butterfly coil |
| 9016B0151 | . Coil Cooler for Cool Coils |
| 9016B0081 | . Treatment Chair with neckrest and cloth cover |
| 9016B0181 | · Super Flex Arm for Coil Positioning (short) |
| 9016D0031 | . Isolation Transformer MagPro X/R System |
| 9016B0712 | . XH Trolley for MagPro & coil holder accessories |
| 9016B0252 | . Head Stabilizer System (Airtight Pillow and Evacuation Pump) |

CGX

Quick-20 headset

14

**Schedule 3**

**Business Associate Addendum**

This Business Associate Addendum (the "**Addendum**") supplements and is made a part of the Brain Frequency System License and Services Agreement by and between Brain Frequency LLC ("**Business Associate**") and Live in Alignment LLC ("**Covered Entity**") dated January 1, 2024, as may be amended from time to time (the "**Agreement**").  Covered Entity and Business Associate may be referred to herein collectively as the "**Parties**" or individually as a "**Party**".

WHEREAS, under the Agreement, Business Associate provides certain services to Covered Entity as further set forth therein (the "**Services**"), which Services may require Business Associate to receive, create, maintain, transmit, Use or Disclose Protected Health Information.

WHEREAS, Covered Entity and Business Associate intend to protect the privacy and provide for the security of Protected Health Information Disclosed to Business Associate in connection with the Services in compliance with this Addendum and the Health Insurance Portability and Accountability Act of 1996, Public Law 104-191, as amended, along with its implementing regulations promulgated by the Secretary of the Department of Health and Human Services ("**HHS**"), including, the "**Privacy Rule**" (45 C.F.R. Part 160 and Subparts A and E of Part 164) and the "**Security Rule**" (45 C.F.R. Part 160 and Subparts A and C of Part 164), as each may be amended from time to time (collectively, "**HIPAA**").

WHEREAS, Covered Entity and Business Associate intend for this Addendum to meet those requirements under HIPAA that mandate a written agreement between Covered Entity and Business Associate that sets forth each Party's respective obligations in connection with Business Associate's Use or Disclosure of Protected Health Information in connection with Business Associate's performance of the Services.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

1.      **Definitions**.  All capitalized terms not otherwise defined in this Addendum have the meaning ascribed to them under HIPAA.  The meanings given to the terms "**Disclosure**" and "**Use**" in 45 C.F.R. 160.103 shall also apply to those capitalized terms used herein that are in the plural or in any tense or variant of the terms Disclosure and Use, such as "**Discloses**" and "**Used**".  "**PHI**" means Protected Health Information transmitted or maintained in any form or medium, including, Electronic Protected Health Information ("**e-PHI**"), that is created, received, maintained, transmitted or made available by Covered Entity and is Used or Disclosed by Business Associate in order for Business Associate to perform the Services.  "**Unsecured PHI**" shall mean Unsecured Protected Health Information that is created, received, maintained or transmitted by Covered Entity and is Used or Disclosed by Business Associate in order for Business Associate to perform the Services.

2.      **Term**.  This Addendum shall be effective as of the effective date of the Agreement and shall continue in full force and effect until terminated in accordance with the terms of this Addendum. Upon the termination of this Addendum for any reason, Section 6.4 hereof shall apply.

3.      **Obligations of Covered Entity**.

        3.1      Rights to Information; Safeguards.  Covered Entity represents and warrants that it has, and will have throughout the term of this Addendum, legal authority, in compliance with HIPAA and all other applicable federal and state laws, to access, Use, Disclose, transmit and otherwise make available to Business Associate all PHI.  Covered Entity shall comply with HIPAA and all federal and state laws applicable to Covered Entity governing the privacy and security of health information.  Covered

Entity shall implement and maintain reasonable and appropriate administrative, technical and physical safeguards to ensure the privacy and security of PHI in accordance with the applicable standards and requirements under HIPAA. With respect to e-PHI, Covered Entity shall safeguard the confidentiality, integrity, and availability of all e-PHI Covered Entity creates, receives, maintains, or transmits (e.g., encrypting e-PHI during transmission), and protect against any reasonably anticipated threats or hazards to the security or integrity of e-PHI and any reasonably anticipated uses or disclosures of e-PHI that are not permitted or required under HIPAA. Covered Entity shall implement and maintain reasonable policies and procedures as required under HIPAA and require its Workforce to comply with such policies and procedures. Covered Entity shall provide training to the members of its Workforce on such policies and procedures and applicable law pertaining to the privacy and security of PHI.

3.2    <u>Permissible Requests; Minimum Necessary</u>.  Covered Entity shall not request Business Associate to Use or Disclose PHI in any manner that, if done by Covered Entity, would not be permissible under HIPAA or other applicable law, or any applicable third-party agreement to which Covered Entity is a party.  Furthermore, Covered Entity shall adhere to all applicable minimum necessary standards established from time to time by HHS or any other government agency with respect to PHI that Covered Entity Discloses or otherwise makes available to Business Associate.

3.3    <u>Notice of Privacy Practices</u>.  Covered Entity shall identify for Business Associate all terms of Covered Entity's Notice of Privacy Practices ("**NPP**") that will affect Business Associate's performance under the Agreement or this Addendum no later than five (5) days after the execution of the Agreement or any changes to the NPP.

3.4    <u>Prompt Notification</u>.  To the extent that it affects Business Associate's performance of its obligations under this Addendum, the Agreement or HIPAA, Covered Entity shall promptly notify Business Associate of any and all requests Covered Entity receives by or on behalf of any and all Individuals with respect to Covered Entity's obligations under 45 C.F.R. Sections 164.522 (restricting Disclosure of PHI), 164.524 (providing access to or a copy of PHI), 164.526 (amending PHI), or 164.528 (accounting of Disclosures of PHI).

3.5    <u>Authority</u>.  Covered Entity represents and warrants that it is authorized under HIPAA, all applicable laws and all applicable third-party agreements to which Covered Entity is a party to Disclose PHI to Business Associate for the purpose of Business Associate's performance of the Services.  Covered Entity shall promptly notify Business Associate if the immediately preceding sentence ceases to be true, including instances where a third party or Individual implements any restriction or limitation which may affect Business Associate's ability to provide the Services or to Use or Disclose PHI pursuant to the terms of this Addendum.

4.    **<u>Obligations of Business Associate</u>**.

4.1    <u>Permitted Uses and Disclosures</u>.  Subject to the terms of this Addendum, Business Associate may Use or Disclose PHI in its performance of the Services, as follows:

4.1.1    <u>Generally</u>.  Business Associate may Use or Disclose PHI as permitted hereunder to provide or perform the Services, as Required By Law, and as otherwise permitted under HIPAA and applicable law.  Covered Entity authorizes Business Associate to de-identify PHI in accordance with the terms of 45 C.F.R. 164.514 and to Use PHI to provide data aggregation services relating to the Services, the Health Care Operations of Covered Entity, and as otherwise permitted under HIPAA.

4.1.2    <u>Amount of Information</u>.  Business Associate shall adhere to all applicable minimum necessary standards established from time to time by HHS or any other government agency with respect to PHI that Business Associate Uses or Discloses in its performance of the Services.

16

4.1.3   <u>Use for Management and Administration</u>.  Business Associate may Use PHI for the proper management and administration of Business Associate if such Use is necessary for the proper management and administration of Business Associate or to carry out the legal responsibilities of Business Associate.

4.1.4   <u>Disclosure for Management and Administration</u>.  Business Associate may Disclose PHI to a third party for the proper management and administration of Business Associate if: (i) the Disclosure is Required By Law; or (ii) Business Associate obtains from such third party reasonable assurances that: (a) the PHI Disclosed will be held confidentially and in compliance with HIPAA, and Used or further Disclosed by such third party only as Required By Law or for the purpose for which it was Disclosed to such third party; and (b) the third party will notify Business Associate of any Breach or potential Breach of Unsecured PHI of which such third party becomes aware.

4.2   <u>Uses or Disclosures Requiring Prior Authorization</u>.   Business Associate understands that, except as expressly provided in this Addendum or permitted under HIPAA, it shall not Disclose PHI to any third party without first having received an authorization that complies with 45 C.F.R. 164.508 ("<u>Authorization</u>") from the affected Individual(s).  To the extent Disclosure of PHI to a third party is required for Business Associate to render the Services, Covered Entity shall assist Business Associate in obtaining, or obtain for Business Associate, the necessary Authorizations.

4.3   <u>Prohibited Uses and Disclosures</u>.  Business Associate shall not sell PHI or Use PHI for Marketing purposes, except as directed by Covered Entity in writing with Authorizations from all applicable Individuals.  Business Associate shall not Use or Disclose PHI other than as permitted or required by this Addendum or as Required By Law, and shall not Use or Disclose PHI in any manner that would violate HIPAA if done by Covered Entity.

4.4   <u>Security Matters</u>.

4.4.1   <u>Safeguards</u>.  Business Associate shall comply with the Security Rule with respect to e-PHI.   Business Associate shall implement and maintain reasonable and appropriate administrative, technical and physical safeguards to prevent the impermissible Use or Disclosure of PHI, in accordance with the applicable standards and requirements under HIPAA.  Business Associate shall safeguard the confidentiality, integrity, and availability of all e-PHI Business Associate creates, receives, maintains, or transmits (including, without limitation, encrypting e-PHI during every transmission) and protect against any reasonably anticipated threats or hazards to the security or integrity of such e-PHI.

4.4.2   <u>Reporting Obligations</u>.

(a)   <u>Reporting Breaches</u>.  Business Associate shall comply with the notification requirements under HIPAA relating to a Breach of Unsecured PHI, including the applicable provisions set forth in 45 C.F.R. Sections 164.400 through 164.414 (collectively, the "<u>Breach Notification Rule</u>").  Business Associate shall promptly report to Covered Entity's Privacy Officer, Security Officer or other designee, any Use or Disclosure of Unsecured PHI that is not permitted under this Addendum or HIPAA.  Business Associate shall report to Covered Entity any impermissible Disclosure of Unsecured PHI that Business Associate believes may constitute a Breach of Unsecured PHI within forty-five (45) calendar days from the date that Business Associate discovers such impermissible Disclosure.

(b)   <u>Cooperation</u>.  The Parties shall cooperate with each other as reasonably necessary for each Party to comply with the Breach Notification Rule.  Business Associate shall provide Covered Entity with such information known to Business Associate as may be required for Covered Entity to determine if a Breach occurred, and to notify affected Individuals of such event if so required under the Breach Notification Rule.

(c)    <u>Reporting Security Incidents</u>.  Consistent with this Section 4.4, Business Associate shall promptly notify Covered Entity of any Security Incident of which Business Associate becomes aware that affects Business Associate's information systems that maintain PHI ("<u>Successful Security Incidents</u>").  Notwithstanding the immediately foregoing sentence, Business Associate and Covered Entity acknowledge the ongoing existence and occurrence of attempted but unsuccessful Security Incidents that are inconsequential or harmless in nature, such as pings and port scans, and Business Associate is not required to provide Covered Entity with subsequent notification upon the occurrence of such unsuccessful Security Incidents.  At Covered Entity's written request, Business Associate shall provide Covered Entity with information regarding Successful Security Incidents to the extent reasonably known by Business Associate, including the date of such Security Incidents, the scope of such Security Incidents, Business Associate's response to such Security Incidents, and the identification of the person or entity responsible for causing such Security Incidents.

(d)    <u>Notice of Breach or Security Incident</u>.  To the extent required under this Section 4.4, Business Associate shall notify Covered Entity of any Breach of Unsecured PHI or Successful Security Incident in writing pursuant to the Notice provision set forth in the Agreement or by way of electronic mail to the email address identified by Covered Entity for such notifications.

4.5    <u>Requested Restrictions</u>.  To the extent instructed by Covered Entity in writing, Business Associate shall comply with a request by an Individual to restrict Disclosure of the Individual's PHI to a health plan in accordance with 45 C.F.R. 164.522.  Business Associate shall promptly direct to Covered Entity such requests Business Associate receives directly from an Individual.

4.6    <u>Availability of Information</u>.  Business Associate shall make available to Covered Entity such information in Business Associate's possession that is reasonably necessary to permit Covered Entity to fulfill its obligations to provide access to, provide a copy of, to amend and to account for Disclosures of PHI pursuant to 45 C.F.R. 164.524, 164.526, and 164.528.

4.7    <u>Business Associate's Subcontractors</u>.  Business Associate shall enter into a written agreement with each of its Subcontractors that satisfies the applicable requirements under HIPAA with respect to Subcontractor's Use or Disclosure of PHI.

4.8    <u>Internal Practices</u>.  Business Associate shall make its internal practices, books and records relating to the Use and Disclosure of PHI available to HHS for purposes of determining Covered Entity's compliance with HIPAA.

4.9    <u>Application of Privacy Rule</u>.  To the extent Business Associate is to carry out a function or obligation required of Covered Entity under the Privacy Rule, Business Associate shall comply with the requirements under the Privacy Rule that apply to Covered Entity in the performance of such function or obligation.

4.10    <u>Mitigation</u>.  Business Associate shall take reasonable steps to mitigate, to the extent practical, any harmful effects known to Business Associate arising from a Use or Disclosure of PHI by Business Associate or its Subcontractors in violation of this Addendum.

5.    **State Law**.  Covered Entity shall notify Business Associate in writing, and in advance of Disclosing or making available any PHI to Business Associate, of all provisions or requirements under applicable state law concerning privacy or security of health information that may affect Business Associate's performance under this Addendum or the Agreement.

132161420.8

6. **Termination**.

6.1    Without Cause.  Upon the expiration or termination of the Agreement, either Party may terminate this Addendum without cause by providing at least thirty (30) days' written notice to the other Party.

6.2    Noncompliance.  Either Party may terminate this Addendum upon thirty (30) days' written notice to the other Party in the event that the other Party materially breaches this Addendum and such breach is not cured within such thirty (30) day period.  Notwithstanding the foregoing, Covered Entity may terminate this Addendum immediately upon written notice to Business Associate if Business Associate materially breaches this Addendum, and such breach is not capable of being cured and presents a continuing material risk to the confidentiality, integrity and availability of PHI, as determined by Covered Entity in its reasonable discretion.

6.3    Criminal and Civil Proceedings.  Either Party may immediately terminate this Addendum upon written notice to the other Party if the other Party is named as a defendant in a criminal proceeding that involves a violation of HIPAA or a finding or stipulation is made in any administrative or civil proceeding, in which such other Party has been joined, that the other Party has violated any standard or requirement of HIPAA or other applicable law pertaining to the privacy or security of health information.

6.4    Effect of Termination.  Upon termination of this Addendum, the Agreement shall also terminate to the extent that either Party's performance thereunder requires Business Associate to receive, create, maintain, Use or Disclose PHI.  Upon termination of this Addendum, Business Associate shall return to Covered Entity, or destroy, all PHI that Business Associate maintains in any form, and shall retain no copies of such PHI; provided, however, if the return or destruction of any PHI is not feasible, as reasonably determined by Business Associate, Business Associate shall continue to extend the protections of this Addendum to such PHI and limit further Use or Disclosure of such PHI to those purposes that make the return or destruction of such PHI infeasible.  Any term or provision of this Addendum that, by its nature, is intended to survive the termination of this Addendum, shall survive the termination of this Addendum, including Sections 1, 3.4, 4.4.2, 6.4, and 9 through 12 hereof.

7.    **Disclaimer**.  Neither Party represents or warrants to the other Party that compliance by the other Party with this Addendum will be adequate or satisfactory for such other Party's own purposes, including such other Party's compliance with applicable law, or that any information in such other Party's possession or control, or transmitted or received by such other Party, is or will be secure from unauthorized Use or Disclosure.  Each Party is solely responsible for all decisions made by such Party regarding the safeguarding of PHI.

8.    **Change of Law**.  The Parties acknowledge that state and federal laws relating to the privacy or security of health information, including HIPAA, are rapidly evolving and that the Parties may be required to amend this Addendum in order to ensure each Party's compliance with such laws.  Accordingly, if either Party reasonably determines that this Addendum must be amended in order for the Parties to be compliant with applicable law or regulation, such Party shall so notify the other Party, and the Parties shall then promptly enter into negotiations concerning the terms of such amendment.  If either Party requests an amendment to this Addendum pursuant to this Section and (i) the other Party fails to promptly enter into negotiations to establish the terms of such amendment, or (ii) the other Party terminates such negotiations or refuses to enter into the agreed upon amendment following such negotiations, then either Party may terminate this Addendum, and that portion of the Agreement for which Business Associate's Use or Disclosure of PHI is necessary, upon thirty (30) days' advance written notice to the other Party.

9.    **No Third-Party Beneficiaries**.  Nothing express or implied in this Addendum is intended to confer, nor shall anything herein confer, upon any person other than Covered Entity and Business

Associate and their respective representatives, successors and assigns, any rights, remedies, obligations or liabilities whatsoever.

10.    **Independent Contractor**.  Nothing contained herein shall be deemed or construed by the Parties or by any third party as creating the relationship of employer and employee, principal and agent, partners, joint venturers or any similar relationship between the Parties.  Covered Entity and Business Associate acknowledge that Business Associate is an independent contractor, and not an agent, of Covered Entity.

11.    **Miscellaneous**.

11.1    <u>Entire Agreement</u>.  To the extent this Addendum conflicts with any terms in the remainder of the Agreement, this Addendum will govern.  Otherwise, except as expressly modified, amended or supplemented by this Addendum, the terms of the Agreement shall remain in full force and effect, including, without limitation, all limitations of liability and damages set forth in the Agreement.

11.2    <u>Modification</u>.  This Addendum shall be amended or superseded only by a written instrument that references this Addendum and is signed by both Parties.

11.3    <u>Provisions Severable</u>.  The provisions of this Addendum are independent of and severable from each other.  No provision will be affected or rendered invalid or unenforceable by virtue of the fact that, for any reason, any one or more of any of the provisions of this Addendum may be deemed invalid or unenforceable in whole or in part.

11.4    <u>Interpretation</u>.  The Background paragraphs of this Addendum are hereby incorporated, in full, into the body of this Addendum.  Any ambiguity in this Addendum shall be resolved in favor of a meaning that complies with, and is consistent with, HIPAA.  The Section titles and headings in this Addendum are for convenience of reference only and shall not be used to interpret or construe its provisions.  Any reference in this Addendum to a section in HIPAA or any other law, regulation or guidance means such referenced authority as amended from time to time.  The words "include" or "including" are intended to be interpreted as if followed in each case by the words "without limitation."

**Schedule 4**

**Brand Guidelines**

132161420.8